Good morning. Our first case on the, excuse me, on the call of the docket today, Tuesday, May 17th, 2011, 9 a.m. is Agenda Number 9, Case Number 11-0882, Sierra Club et al. versus the Illinois Pollution Control Board. Counsel for the appellant. Thank you, Mr. Chief Justice. May it please the Court. My name is David Wentworth, and I represent the, what we've been calling ourselves, the opposition groups, Sierra Club and Peoria Families Against Toxic Waste. I would also like to say good morning to the counsel for the appellees and the members of the public who are present on both sides of this issue. There is cross-relief requested in this case by the appellees pursuant to Supreme Court Rule 352, after consultation with the clerk, after consultation with both attorneys for the appellees. I'm going to, at the pleasure of the Court, obviously, limit my comments to the main issue for which the petition for leave to appeal was granted during this 20 minutes. Then I believe the appellees are going to talk about both the standing issue, which is their issue on cross-relief, as well as the 27A, and then I would do the rebuttal for the final 10 minutes. Again, at the pleasure of the Court. There are two basic issues associated with Section 27A, and by 27A I mean Section 28.1A of the Environmental Protection Act, as it makes reference to what we call the Section 27A factors. The two issues have two different standards of review. First, whether it's the burden of the petitioner or of the Board to justify consistency with Section 27A, and that would be as a matter of law, obviously with statutory construction. The second issue is whether the Board failed to fully and properly consider Section 27A factors based on the evidence in the record. That would be subject to an arbitrary and capricious standard of review. Regarding as a matter of law, the petitioner for an adjusted standard has to justify consistency with the factors set forth in Section 27A before being granted a delisting. Now that is the statute itself. You are not going to touch on standing? At the pleasure of the Court, I can. I was going to reserve that after the cross-relief argument is given. Okay, we can wait until then. That's fine. Okay. You may proceed. So you're going to do that during your rebuttal time? Yes, if that's okay with the Court. I did not want to do an anticipatory rebuttal before they even present their argument, so I'm going to reserve that for my rebuttal. Okay. Section 27A, as a matter of law, is fully set forth in the brief, and essentially the issue comes down to whether or not the burden is on the petitioner, in this case Peoria Disposal Company, PDC, or on the Board to justify compliance or consistency with the Section 27A factors in a site-specific delisting, an adjusted standard for one particular site or one particular type of waste. On that point, it makes sense to require the petitioner in an adjudicatory proceeding, kind of a contested case, to have the burden to present evidence that what the petitioner wants to do with that waste at that particular facility or wherever it may ultimately be disposed is done in full compliance with the Section 27A factors that apply to rulemakings of general applicability, as well as a site-specific adjusted standard proceeding. The Code, the Petition Control Board Code and regulations establishing procedures for adjusted standards, also indicates in Section 104.426 that the burden of proof in an adjusted standard proceeding is on the petitioner. A petitioner must justify an adjusted standard consistent with Section 27A of the Act. That last part of that quote essentially mimics and mirrors the language of Section 28.1A itself. So the primacy of the statute controls. We respectfully submit that it's the burden on the petitioner, in this case Peoria Disposal Company, to set forth evidence in the record of a delisting to justify consistency with the Section 27A factors for that PDC landfill number one and waste stabilization facility located on the doorstep of Peoria. Mr. Wentworth? Yes, Justice Burke. Can the adjusted standard be analyzed as to a zoning ordinance? Can you look at it in the same way? Section 27A requires the board or the petitioner to take into account the surrounding land uses and does mention the word zoning. So it is a very local control or a local issue, not unlike a typical zoning case. This court has also done several cases on landfill siting appeals, which that law, Section 39.2 of the Act, was adopted in 1981. The adjusted standard proceedings were adopted in 1984. As this court knows, the local siting is imbued with evidence of local control, of issues on zoning location, et cetera. We submit in our brief that 28.1, which references 27A, that 27A mirrors or is very similar to Section 39.2, which again goes to the zoning. Even if the court does not think that as a matter of law the board erred and that 27A is just a board duty, not a burden on the petitioner, we respectfully submit that the board failed to fully and properly consider Section 27A and acted in an arbitrary and capricious manner by relying on factors the legislature did not intend and for entirely failing to consider an important aspect of the problem. In this regard, I'd like to illustrate how the board acted in an arbitrary and capricious manner. The board essentially couldn't see the forest for the trees. It focused too much on certain aspects of the delisting, but then ignored and missed the point about the Section 27A factors. Regarding the area affected by PDC's activities, the board focused pretty much solely on where the end product, this treated EAF dust stabilization residue, where it was going to ultimately be disposed of in a landfill and addressed many of its concerns toward the safety of after this stuff is treated, how is it going to act in a landfill. Mr. Wellman, we will not be able to find, there was a 97-page single-spaced order filed, right? Correct. By the board. And they did address 27A concerns, right? You would agree in that 97 pages they did address those, but not the right concerns? Is that your? My concern, Justice Thomas, is that the board, in applying the Granite City case, said that there was no threshold of evidence and that the board could pick and choose which of the Section 27A factors it needed to consider. Were they even required to file this 97-page document? Absolutely. Section 28.1 requires the final order, a determination to be filed, and other sections of the Environmental Protection Act, as well as the, I believe the Administrative Procedures Act, require the board to follow through to a final order on an adjusted standard. The board couldn't see the forest for the trees by focusing only on where the EAF dust was going to be disposed of and not what happened at the PDC No. 1 landfill with the waste stabilization facility on the doorstep of the city of Peoria. It ignored the treatment process, and all of our concerns were reflective of that location, that site, and it ignored those. In point of fact and law, the code regarding adjusted standards at Section 104.406D requires a petitioner, in this case PDC, to provide a description of the nature of the petitioner's activity that is subject of the proposed adjusted standard. The description must include the location of and area affected by the petitioner's activity. This is not a Section 27A requirement. This is authorized by 28.1, the adjusted standard statute itself, but it's a board requirement and the board's own rules. Now, as set forth in our briefs, the PDC didn't really put anything in the record about the surrounding land area, the zoning of the surrounding area, the impacts that the continued operation of the waste stabilization facility may have on the 53,000 or so people that live within three miles of this site. The agency, the Illinois EPA, was also required under the code to file a response to the petition, which they did on June 12th of 2008, and two things spring forth from that. First, as to that Section 104.406D, the agency said, quote, the Illinois EPA does not take issue with PDC's statements on this topic. Well, there really weren't any statements on the topic, and yet the agency kind of gave PDC a pass. In addition, the agency, in its response, said under a separate heading entitled Section 28.1 factors, which they incorporated the 27A, the agency calls them 28.1 factors, but I've been referring to them as the 27A factors, quote, in accordance with Section 28.1A of the Act, persons seeking a RCRA waste delisting must justify the requirement consistent with Section 27A. The comments made above for the factors set forth in Section 104.406, including 406D, apply to the Section 28.1 factors as well as the 720.122 factors. Thus, in the same sentence that the agency, the Illinois EPA, said, it's the petitioner's responsibility to comply with the Section 27A factors, they gave them a pass by impermissibly substituting the level of justification under Code Section 720.122, substituted that for the zoning, the surrounding area for the locality issues of Section 27A. Now, the Board did the same thing in its opinion, and I call it 103 pages with the attachments, but it's 97 single-space typed pages. The Board did the same thing by substituting its technical compliance with the level of justification for a robust analysis of the Section 27A factors. The Board relied on DRAS, the delisting risk assessment software, which assesses delisting levels as the waste is disposed in a worst-case scenario, assumed by the DRAS model, of an unlined landfill or an unlined surface sediment pond. Do we have to find that the Board acted arbitrarily and capriciously in order to overturn their decision? No, Justice Garmon. Our first part of the argument is that as a matter of law, by failing to require the petitioner to meet its burden of proof, the Board misinterpreted 27A and, as a matter of law, should be reversed, because it didn't follow the law. What I've been speaking on now is exactly that, the arbitrary and capricious standard, that they failed to properly consider all aspects of the problem or injected things that the legislature did not intend. And to conclude on this point, I don't want to also not see the forest for the trees and go on on this issue too long, but PDC, the agency, the Board, and DRAS itself all focus on the disposal. But disposal is only half of the story. This stuff is a treatment process, and that treatment process is located at the Waste Stabilization Facility and PDC No. 1 on the doorstep of Peoria. When Section 27A came up in the order, the Board ignored the character of the land involved, ignored the character of the surrounding land uses and zoning classifications, essentially thinking that if you meet the level of justification, well, then all the other stuff must be okay. That's not what the statute says, and that's not what the law requires. The Board stated in its opinion on page 81 that it carefully considered the information in this record in view of the Section 27A factors as required by Section 28.1A, but that begs the question of what was in the record. There really is nothing in the record that allows evidence submitted by Peoria Disposal Company regarding the surrounding land uses. Now, even if in the brief PDC attempted to kind of buttress after the fact that it really did have stuff in the voluminous record that addressed these local issues, but none of those focus on the surrounding area. They only focus on the Waste Stabilization Facility. They do talk about the Indian Creek Landfill, which is a controlled landfill of PDC where which the successfully treated waste ultimately gets disposed. Essentially, the treated electric arc furnace dust is still hazardous unless and until it meets the screening levels for each constituent of concern. That's at page 75 of the order. So when the waste is initially treated, they still are using the entire footprint of the landfill, which is just 200 feet from some nearby residences, and we respectfully submit that the board did not sufficiently and fully consider those issues. It failed to fully and properly consider the treatment process and the effects of the treatment process on the surrounding area. If the Granite City case, which we've taken issue with, states that we've taken issue with the board's interpretation of the Granite City case. Granite City was a pure rulemaking case that rulemaking is of general applicability. It's everywhere in the state. So if it's safe, environmentally responsible in one place, it's safe everywhere. On the other hand, or in this case, this was an adjudicatory kind of a contested case involving one specific petitioner with a finite known location. So this isn't in a broad sense anywhere in the state of Illinois. This is in Peoria, Illinois, that this treatment process is happening. So section 28.1D3 states that the board must state the facts and reasons leading to the final board determination. And this is the sentence that the board left out of its order. That is the quote that ties everything together in the Granite City case. So even though Granite City held that there was no burden of proof for a rulemaking of general applicability, that the board acting as a quasi-legislative body didn't have to hang its hat on, yeah, we looked at this issue, yeah, we looked at that issue. They were the legislature and their discretion, they could do that. In this case, with the adjusted standard, Granite City says, the board must then use its technical expertise and judgment in balancing any hardship for the regulations may cause to discharges against its statutorily mandated purpose and function of protecting our environment and public health. That sentence does not appear in the 97 or 103 page board opinion. That sentence is essentially the common thread that is weaved through our entire argument regarding the section 27A factors. We respectfully submit that the judgment, that the order of the board should be reversed as a matter of law. In the alternative, if the board, if the court finds that the board properly construed section 27A from a statutory interpretation perspective, we nonetheless believe that the board, as illustrated by my arguments, failed to properly consider all aspects of the problem as required under section 27A, that it acted in an arbitrary capricious manner, that it should be either reversed or that the order be vacated and remanded back to the board for further consideration. Thank you. Thank you, Mr. Wentworth. Counsel for the appellees. Thank you, Mr. Chief Justice, and may it please the court. My name is John Schmidt, and I'm an assistant attorney general. I represent the Illinois Pollution Control Board. I'll be dividing time with Ms. Manning, counsel for Peoria Disposal Company. I will be focusing on the standing issue and arguing that the opposition groups did not have standing to pursue this appeal because they do not fall within any of the five categories of persons who may appeal final board determinations. That is set forth in section 41 of the act. Let me ask you about something, Mr. Schmidt, just to lead off that argument. On May 11th, last Wednesday, the board filed additional authority in support of the argument concerning the board's compliance with section 27A, right? Yes, that's correct, Your Honor. And in that, the additional authority included a 70-page rulemaking order that the board filed in 1989, right? Yes, that's correct. And the board cites a portion of that order on page 22 of that document, but I want to focus on a page that wasn't cited of that same order, page 23. And there seems to be, at least at first blush, a statement that completely undermines the position on the standing question. So I do want you to address this, even though it wasn't cited. And let me just read from that page 23. The board believes that an appeal of an adjusted standard decision would be available to any person, as it is in a rulemaking context. The board cannot see a distinction between the public's interest in an appeal of an environmental standard, which was promulgated as a rule, as opposed to one which was adopted pursuant to an adjusted standard proceeding. Now, it does go on to say, ultimately, though, it's for the courts to decide who has standing to appeal a board's decision made pursuant to section 28.1. And I know there's been 20-plus years since that, and certainly you're entitled to change your position, but I think it should at least be addressed. Oh, certainly, Your Honor, certainly. And the board has changed its position. And as Your Honor pointed, there is one other portion of that statement that I would draw the court's attention to. And there is a portion of the statement in which the board indicated that an adjusted standard is not a rule. And that is very important in that case, because in this case, because the opposition groups are hanging their hat on, in terms of the standing argument, on an adjusted standard being rulemaking. They are claiming standing under section 29A of the Act, which allows appeals from rulemaking orders of the board by any person who is adversely affected. So if this is not rulemaking, they do not have standard. Okay, Mr. Schmidt, let me back you up. What is the basis for the board's change of position that you just referenced? I believe the fact that in this case, in a direct administrative review action, the appellate court's authority must have a statutory basis. And that's under the Illinois Constitution, Article VI, Section VI, says that the appellate court will have such jurisdiction to consider direct administrative review actions as provided by law. So this is the one instance where the court's authority would have a statutory basis. And so what the relevant statutes tell us is Section 28.1 says that these are adjudicatory determinations. And it says that rulemaking provisions in the Administrative Procedure Act and in the Environmental Protection Act itself do not apply. So Section 28.1 tells us the legislature says this is not rulemaking. And then Section 28.1G says that final board determinations may be appealed under Section 41, but the opposition groups simply don't fit within the Section 41 categories. So is the difference of opinion now that back in 89 you were saying it was analogous to rulemaking and now you're saying that's not good enough? It actually has to be rulemaking? Is that your position now? Yes, and that the legislature, and what we're saying is it's up to the legislature, and the legislature has said this is not rulemaking. And we admit there are some components of this certainly that have some similarity to rulemaking. And the main thing in that regard would be the fact that the board can impose conditions on a delisting. And that is sort of a quasi-legislative aspect. But there are also certainly adjudicatory aspects to a delisting. The board considers evidence and rules upon whether the levels of justification were met in terms of the delisting. But what is important and what we believe is dispositive is that the legislature has said this is not rulemaking. And Mr. Schmidt, in that context, does it specifically address standing issues? Who has the right to appeal in that context? Well, Section 41 does, Your Honor. I realize that, but the change that you're referencing on why the board changed its position. Is there a corresponding provision in the statute now that indicates in this context? There's nothing that specifically says in an adjusted standard proceeding these are the people who have standing. But it's a matter of, but Section 28.1G, which governs adjusted standard proceedings, says that appeals are taken under Section 41. And then Section 41 sets out the categories. And the opposition groups don't fit in any. And they don't argue that they do either. They don't claim to fit within any of those categories. Their entire argument is that standing exists under 29A. But 29A only confers standing if it's a rulemaking provision. And as I've indicated, the legislature has stated this is an adjudicatory determination. The opposition groups attempt to say that Section 28.1, that that language is only concerned with process and not results. But Section 28.1 refers to final board determinations. And that's the result.  And the appeal from that result is governed by Section 41. Under the plain terms, the plain meaning of Section 28.1G refers us to 41. The opposition groups simply don't fit within any of those categories. And that's why they are not, they may not, they do not have standing to appeal. We believe Justice Carter's analysis in his special concurrence was exactly on target, and that this Court should follow that analysis. So we would ask this Court to hold that the Third District should have dismissed the appeal. Just to briefly lead into Ms. Manning, who will basically cover the merits, we do disagree with the opposition groups on the Section 27A question. We believe the Board considered the 27A factors carefully, including the effects on the surrounding area. In that context, what public commenters were concerned about was the possibility of air emissions. The Board pointed out several things in response to this. One is that Peoria disposal remains subject to the Board's air pollution regulations. Peoria disposal's permit from the EPA also contains limits on air emissions. And another important thing that the Board did point out is that there is water used in this chemical treatment process by Dr. Chowdhury, and that water minimizes the possibility of air emissions. So the Board believes that it did address the Section 27A factors adequately, and we also believe that they do not form part of the burden of proof, as the Granite City case would indicate. Indeed, it's difficult to see how they really could. Section 27A doesn't really instruct the Board as to exactly how they are to weigh the factors or what they are to weigh them against. So, again, we believe those are factors for the Board to consider, and the Board did consider them. If there are no further questions, I'll leave the rest of the time to Ms. Manning and thank the Court. Thank you, Mr. Schmidt. May it please the Court. My name is Claire Manning. I'm very honored to appear before you on behalf of my client, Peoria Disposal Company, who asks that the Court affirm the 93-page decision of the Illinois Pollution Control Board. Before I get into the merits, I would like to answer a little bit on the standing issue as well and speak to Justice Thomas and Justice Kilbride's question related to why the Board might have changed in the course of the 20 years. First of all, the supplemental authority that the Attorney General's Office put in was, in fact, the Board's first procedural rule on the adjusted standard. And the information in there is really dicta that followed various, you know, court decisions followed after that where the Board was instructed, follow the law. Don't allow for rights that aren't prescribed in the law. For example, in the Landfill, Inc. case where the Board allowed third parties to come in and challenge permit decisions, the Court's reversed on that ground. So basically, the Board, in 2000, completely redid its procedural rules, allowing intervention on the part of parties to become party status. The law was changed in terms of Section 41. There's a provision if you're a public commenter in a Clean Air Act rulemaking, you have authority to a file appeal under Section 41. So there's all kinds of changes that occurred over the course of 20 years, and those are all referenced in the Peoria Disposal's motion to dismiss that we filed before the Fourth Circuit. I'm sorry, the Third District. And I would ask that you look at those. On the merits, Justice Burke, this is not a zoning case. Much as the opponents would like to turn this into a landfill siting case, this is just not what the context of this case is. This is one of the most highly technical decisions that the Board could make. So what do we really, and on the environmental law, on the environmental regulations, on the questions of the environmental science, the Pollution Control Board was absolutely right. In its 93 or 103-page decision, it was absolutely right on all of it. And what did it do? Number one, it authorized an environmentally safe chemical process and protocol which would inoculate a certain kind of hazardous waste, allowing it to, instead of being sent to a hazardous waste facility, to be sent to any subtitle D facility in the state of Illinois that is lined. This is not a suitability of location issue. This is not a zoning case. This is pure and simple a hazardous waste delisting case, which is prescribed by federal law. The Board made its decision pursuant to a very thoughtful, well-analyzed decision of the Board. It utilized its technical expertise. It had its engineers ask questions prior to the hearing, and it involved complicated state and RCRA laws. Before the filing, before the Pollution Control Board, the Peoria Disposal, its independent consultants was very careful to work both with the U.S. EPA and the Illinois EPA to get the protocol approved to ensure, in fact, that the decision could be affirmed and the waste would be delisted. What this really is is it's alchemy, if you will. It's chemistry that turns what otherwise would be a hazardous waste into, it inoculates it and makes it a non-hazardous waste so that it's capable of being disposed of in a landfill, in a regular municipal waste landfill. In addition to all of that, the consequence of the decision was that Peoria Disposal was then able to continue to accept the steel residue, the steel dust that it had always accepted, it had always treated, it just used to put it in a hazardous waste landfill. It was not allowed to expand that hazardous waste landfill, so this decision then authorized them to take that waste and now move it and allow it to be sent to any lined subtitle D landfill in the state of Illinois. That decision, I would suggest, is in fact a very technical one and what the opponents are attempting to do is argue that somehow 27A factors, the 27A factors are those factors which 40 years of jurisprudence under the Environmental Protection Act instruct the board to look at those factors as they might be applicable in any given context of any given case before them. In this case, the context was a hazardous waste delisting. It was not a review of a local government's decision on whether a landfill should be expanded or should not be expanded. So what the board was doing was as best as possible in the context of this hazardous waste delisting, it utilized the factors as they were applicable. There is no burden of proof on the part of a petitioner to establish any of those kinds of factors. In fact, what the adjusted standard does and says is the adjusted standard, Section 28.1 of the Act, says that in fact the board is supposed to look at in B of that section if the board has a general rule of applicability that sets forward a specific procedure, then that's the justification that applies. And that's what this is here. The adjusted standard in 28.1 is simply a vehicle to get the board to do what the U.S. EPA could do in the federal context or what the state will do and that is determine whether a waste is absolutely capable of being delisted if it's inoculated sufficiently in order to be safely disposed in a non-hazardous waste landfill. And that's what the board did. And the board has hazardous waste regulations that are based directly on federal law. At 720.122, it prescribes the level of justification that Peoria Disposal was supposed to adhere to. Peoria Disposal did that. They hired an independent consultant. The independent consultant had an independent laboratory. They had all kinds of analytical. I could, you know, sort of sway your head with all of the testing that was done, but in terms of the MEP testing, the TCLP testing, all of this was done for the point that the Act and the board's regulations allow this particular procedure. They allow a particular waste to be taken out of the hazardous category and be turned into inoculated such that it's no longer hazardous. The key considerations of what the board really had to find is, number one, that the residue after treatment doesn't meet any of the criteria for which the waste was listed originally as being hazardous. Number two, that there's no reasonable basis to believe that there are any other factors or any other constituents in that waste other than those that originally caused it to be listed as hazardous. And number three, that the residue exhibits no characteristic of hazardous waste. That's what the board was supposed to do. That's what the board did. In addition to that, because the legislature said to the board, whenever you make a decision, also consider the 27A factors, the board did that. The board did it consistent with the Granite City case, consistent with the Shell Oil case, consistent with the Stepin case, all of which challenged the board, you know, in terms of how the board did the 27A factors. The opponents would have you say that somehow PDC was supposed to figure out what particular 27A factors were applicable or not applicable and somehow had some level of burden of proof related to the 27A factors. I would submit that if the court would find that, that would really turn 40 years of environmental law jurisprudence on its head because nobody would know exactly what it was they were supposed to be proving because those 27A factors are the board's factors. The Attorney General's Office did a very nice job at explaining how those work, much like child custody kinds of issues, much like the discretion that a circuit court has in criminal sentencing matters. That's what those considerations are supposed to be on the part of the board and I would submit the board did a very good job in its very lengthy decision of trying to figure out how those factors apply. They knew that one of the landfills, probably the most likely landfill that this waste would go to, would be the Indian Creek landfill in Tazewell County and so they looked at that particular landfill to ensure that it was well run and those kinds of things. So they did look at the 27A factors as they believed them to be applicable. That's what the law allows and that's what the law requires and I would submit that the board did a fine job in analyzing all of these very highly technical, highly scientific kinds of issues and that's really what's before the court. And that's why standing... Am I out of time? I'm sorry. Thank you. I appreciate the court's time. Thank you. Mr. Wentworth. Regarding standing first, and I do have two comments at the end if I still have time, back on the 27A factor, but I thought I'd better get some standing stuff before the court. As Mr. Schmidt said, we have claimed that it's the process versus the result and that the adjudicatory moniker is merely the process by which a rule of the board, it doesn't say it has to go through rulemaking or the process to get a rule, but it's a rule of the board. Section of the code 104.400A states, quote, an adjusted standard has the effect of an environmental regulation. So the net product of this large order is that PDC gets a pass on EAF dust if it treats it according to the adjusted standard. It's not deemed hazardous anymore. It can go to any... With the conditions that the board put on it, it can go to any one of those locations. Mr. Wentworth, 28.1 doesn't state that the adjusted standard proceeding is adjudicatory. Rather, it says that the board's determination is adjudicatory. And doesn't that speak to result and not to process? Correct. And I want it to be the result. The end result is that it's a rule or regulation of the board. Well, as I understand your argument, isn't your argument that 28.1 provides for an adjudicatory process? Correct. All right. But I think you're arguing, and maybe I'm wrong, that an adjudicatory process can nevertheless result in a legislative result. Correct. So, but 28.1 says that the adjusted standard proceeding is adjudicatory. Rather, it doesn't say that. Rather, it says that the board's determination is adjudicatory. And that speaks to the result, right? You're saying the adjudicatory process, it can amount to a result, right? But it's a little confusing. Go ahead and answer the question. Maybe we'll get there. I hope so, Justice Thomas. Section 28.1A says in a subsequent adjudicatory determination, an adjusted standard for persons who can justify could be granted. So the phrase is in a subsequent adjudicatory determination. Adjudicatory, again, speaks in terms of the process by which, as we keep arguing, a rule or regulation of the board is developed. The board itself says that it has an effect of an environmental regulation. So when you look at the enabling statutes for judicial review, 28.1, in conjunction with 41 and 29, they all speak in terms of the net result. And they don't, in those judicial review sections, implicate what kind of proceeding it was. They don't say an adjudicatory or a rulemaking. Let me put it this way. Is it not your position that an adjudicatory process can result in a legislative result? That is my position. Right. And 28.1 says that the board's determination, the board's result is adjudicatory. Right? You're saying it can end up with a legislative result. And I think what I see as the problem with that argument is 28.1 says that the board's determination, the board's result is adjudicatory, not legislative. If I may, in the context of 28.1A, when it then goes on to say that the rulemaking provisions of the Illinois Administrative Procedure Act and Title VII of the Environmental Protection Act don't apply to these adjusted standards, it uses the phrase, the rulemaking provisions. The Illinois Administrative Procedure Act talks in terms of publishing with the Joint Commission and the notice and the economic impact study and all of that. The legislative history that we've set forth in the brief states that Section 28.1 was added to the Act to streamline the rulemaking process for site-specific places to avoid the cumbersome nature of a site-specific rulemaking that's always been available under Section 27A. So in context of the whole subsection A of 28.1, Justice Thomas, we submit that it's more of the focus is on the process there that it's adjudicatory, but the net result, what the board, the final board determination, which is subject to the enabling statutes for administrative review, speaks in terms of that result. Even though it uses the adjudicatory determination. Correct. The board, I'm sorry, Section 28.1 was added to the Act after 29 and 41 were already there. 29 and 41 have been there since the Environmental Protection Act went on the books. The legislature could have said in Section 28.1G that references 41A, could have said that a final board decision can be appealed pursuant to Section 41, except that the final board decision in an adjusted standard shall not be considered a rule or regulation. They didn't do that. But the legislature could have said something like, pursuant to Section 41, but limited to parties in an adjusted standard case. They didn't do that. At all times, the language has been that Section 41A provides that if the net effect is a rule or regulation, there's an administrative review under Section 29. The statutes have never changed since the quote of the 1988 rule that Justice Thomas mentioned that I believe is on page 13 of our reply brief. The statutes never changed in that 40 years or 30 years. The Attorney General was unable to cite a case or a judicial pronouncement that made the board change its position. It's a rule of the board. The only reason why we're arguing about this now is this is the first time that an adjusted standard case got this much attention, given the dynamics of this location. And it's the first time that an adjusted standard case, for site specific, had this level of public involvement to make sure that they judge everything. Is it your position that all adjusted standards that may be adopted under 28.1 are rules then, not relief from rules? Yes, and it's our position that a relief from a rule done by an order of the board is a rule. Mr. Wentworth? Yes. What is the effect of a violation of an adjusted standard versus the violation of the rule? Adjusted standards modify or do whatever to be still consistent with Section 27 rules, right? Correct. So what is the effect for this operator or any operator who violates a rule versus the violation of adjusted standard? Can they be prosecuted in the same way? Can they be subject to the same penalty provisions under the pollution control board agency? If I understand your question, Chief Justice Kilbride, if the adjusted standard order, the requirements of the board, put on purely disposal to comply with these things, and if you do, then it's deemed non-hazardous and can go to a Subtitle D, if they don't follow those rules, then yes, they would be subject to the normal course of environmental violations available in other parts of the Act. There we go. To the point of the net result is a rule or regulation of the board, Section 7.3b3 of the Act requires that an adjusted standard be published in the Illinois Register. That may not go through the normal joint commission rulemaking procedure and the Secretary of State's office may not like it because it's not an official rule that went through that procedure, but it still is a public document that is published in the Illinois Register and has the effect of, for PDC, that rule applies. That adjusted standard applies for what they do. If I may, actually I'm out of time, and thank the court for your consideration. I'll give you a few seconds to conclude. On my one point, as Justice Thomas referenced, the supplemental authority that was filed in point on the Rule 81-17, which predate and was the combined sewer overflow that was the precursor in the legislative initiative to do 28.1, which came out a couple years later in 1984. If you look at those rules, they had the Section 27a factors buried at the end of the proposed rules, kind of as an afterthought. What the legislature did when they adopted 28.1 is front loaded them, put 27a right up in the front of 28.1a, meaning that it applies to anything else that follows below in the statute. Yes, you can do a specific level of justification, but you still have that burden on the Section 27a factors. Thank you all. Case number 1108A2, Sierra Club et al. v. Illinois Pollution Control Board. Agenda number nine is taken under advisement. Thank you for your arguments.